**STATE of Missouri ex rel. STATE HIGHWAY COMMISSION, Plaintiff-Appellant,**

v.

**Wilson MOORE et al., Harrison Dale Hooker, et al., Defendants-Respondents.**

**No. KCD 28757.**

Missouri Court of Appeals, Kansas City District.

May 1, 1978.

Bruce A. Ring, Chief Counsel, George M. Johnson, Asst. Counsel, Springfield, for plaintiff-appellant.

J. B. Carter, Carter & Becker, P.C., Clayton, for defendants-respondents.

Before WELBORN, Special Judge Presiding, PRITCHARD, J., and HIGGINS, Special Judge.

ANDREW JACKSON HIGGINS, Special Judge.

Action in eminent domain to acquire interests in real estate owned by Harrison Dale Hooker, Allieen Hooker, and Big Piney Aggregate, Inc. Appeal by State Highway Commission from verdict and judgment which awarded the owners $425,000 damages for the taking. Appellant's contentions question the court's rulings in admission of evidence. Affirmed.

Plaintiff petitioned to condemn a number of tracts of land, including the Hooker tract, for construction and improvement of 4.871 miles of Interstate Route 44 between Missouri Highway 28 and the Phelps County line in Pulaski County, Missouri. Commissioners filed their report and both sides excepted from the award of damages for the Hooker taking. September 25, 1974, appears as the date of taking.

Prior to the taking, the Hooker tract consisted of 168.84 acres, lying north of I–44 near Devil's Elbow, a few miles east of the Saint Robert interchange. Part of the tract was utilized as a sand and gravel removal operation on Big Piney River. This operation was affected by the taking of 32.8 acres for new highway right of way through the property.

Harrison Dale Hooker acquired the property in question in 1941. He gave a description of its location and features in which he referred to a bridge on old U.S. Highway 66 and its erosive effect on the course of the river along the property. He identified a lease agreement of 1967 with Big Piney Aggregate for removal of sand and gravel from the tract, and referred to requirements in the lease including maintenance of a levee around the property. The royalty was $0.07 per ton. The lease was modified in 1971 to provide for construction of a lake as the extraction operation progressed, change in method of excavation, and increase in royalty. In his opinion, the highest and best use of his property was mining of sand and gravel. He valued his whole property prior to the taking at $650,-000 to $675,000. He identified the new right of way for I–44 through his property and described the effect of the taking on his property. He expressed a belief of an adverse effect to his property as a result of a new bridge across Big Piney River; he would have no access to I–44; he believed

he would experience difficulty in trying to use a road under a previously constructed bridge. He valued his property after the taking at $200 per acre, $25,000 to $27,000 (net damages of $623,000 to $650,000).

Roscoe Thomas, superintendent for Howard Construction Company at its gravel and ready-mix concrete plant at Waynesville, described the sand and gravel business in the area of the Hooker property, and made some comparisons with Howard's operation on Forestry Service land at Fort Leonard Wood, where Howard paid a royalty of $0.10 per yard. He explained how a crusher is employed to crush rock to designated gradation, and that Howard had not used a crusher on either the Big Piney or Gasconade River sites.

George Winter, Jr., had been in the sand and gravel business since 1946. He described his operation near St. Louis, and his familiarity with the Big Piney Aggregate plant. He valued Big Piney Aggregate's facilities at $300,000 and the land at $1,000 per acre. He valued the whole property prior to the taking at $460,000 to $470,000. He gave the property an after-taking value of $26,000 for a grazing operation. He arrived at net damages for the taking of $430,000. His opinion reflected reports indicating presence of 1½ million tons of gravel on the property.

Harold "Bud" Hoff, with a background in the sand and gravel and construction businesses, was familiar with the Big Piney Aggregate operation in question as its overseer. He described his company's samplings of sand and gravel on the Hooker tract and its predevelopment estimate of 1.8 to 2.5 million tons of sand and gravel in the ground. He calculated that in excess of 600,000 tons of material existed within the new right-of-way taking alone. He did not believe it would be feasible for his company to attempt to operate on the Hooker tract after removal of the right-of-way area. Part of this was attributable to problems of hauling under the old Highway 66 bridge. He described his company's costs of putting its plant in operation and placed the cost of setup as of September 25, 1974, at $353,000.

He described his company's search for a new sand and gravel site, and the eventual relocation at U.S. Highway 63 and Little Piney River. This site, RoHa, was acquired in August, 1973, with the purchase of 610 acres for $138,000. He described increased hauling costs between mine and market, and the lag of 15 to 16 months from acquisition of RoHa to production. He believed his company lost $130,000 in the move from the Big Piney site to RoHa.

R. Dale Rueff, geologist with the Missouri Geological Survey, supported the owners' ideas of the availability of material in the general area of the Big Piney Aggregate operation.

George Wilson appraised subject property and determined the fair market value on the date of taking at $436,246, attributing $267,406 to plant and $168,840 to the 168.84 acres of land. In his after-taking situation, 62.49 acres remaining south of the new right of way had a value of $500 per acre, and 73.55 acres remaining to the north had a value of $200 per acre. He placed the damages at $391,311. He mentioned several comparable sales, and estimated cost of a new plant in excess of $300,000.

J. Harvey Hyams appraised the property and determined its fair market value at the time of taking at $438,000. He believed $0.25 per ton to be a fair royalty, and used a 9% capitalization rate and a 7.768 conversion factor in an income approach to value. His computation did not involve salvage value for the plant. His damages figure was $394,600.

Joseph Movshin made an appraisal of the plant on behalf of the Highway Commission. He estimated net value of the plant in place at $30,875, and reconstruction cost new at $76,500. He was cross-examined on his ideas of cost of plant items.

Charles R. Turner, District Highway Design Engineer, made the acreage computations involved in the Hooker taking. He also described acreages of areas determined to be gravel deposits by Dr. William C. Hayes, a geologist. He also computed costs of constructing haul roads necessary to mining remaining deposits.

Doctor Hayes made a geological study of the Hooker tract. In his judgment there were 850,917 cubic yards of recoverable materials in place, prior to the taking, and 562,898.4 cubic yards of materials remained outside the right of way after the taking.

Bob Harrison made an appraisal of the property for the Commission using acreages, volumes, and values of industrial equipment in evidence via Mr. Turner, Dr. Hayes, and Mr. Movshin. He determined the value of material deposits as of the date of taking at $80,400, to which he added $170 per acre, $88,800, for base value of 49.46 acres of land containing recoverable material. He valued 20 acres of stockpile area at $170 per acre, to which he added rental income for 10.34 years discounted at 9%, for a total of $11,265, excluding the built-up base. He valued 70 acres of land for agricultural purposes at $350 per acre, $24,500. He estimated value of mined-out land at $170 per acre and rounded it at $5,000. In this manner he arrived at a total value for land prior to taking of $129,565. He added improvements at $76,455 for a total pretaking value of $206,000. In the after-taking situation he believed the only improvement remaining was 2,000 feet of haul road, and that the value of the tract now was $62,300 and, thus total net damages of $133,700 were due the owners.

William Baker inspected the scale used at Big Piney Aggregate's plant December 12, 1974. He valued such a scale new at $8,500 to $9,000 and believed that similar scales in present condition would sell for $500 to $2,500.

Norman Goad, operator of a sand and gravel plant, thought it would be feasible to operate such a plant on the Hooker tract in its after-taking condition.

Donald Becker, Jr., a Highway Commission employee in its Division of Bridges, could find no Commission records of any work done to stop scour or to stabilize banks near the old bridge, and described the effect of the new bridges to be built over the Big Piney River upstream and downstream from the (old) bridge.

Jack Bennett was employed as a right-of-way appraiser by the Highway Commission. In his opinion, the pretaking value of the Hooker tract was $124,000 and the improvements $73,500, for a total of $197,500. He appraised the remainder after taking at $66,600, arriving at net damage of $130,900.

Tom McReynolds also appraised the Hooker taking for the Commission. He gave it a pretaking value of $193,000 and valued the remainder at $62,000, for net damages of $131,000. He used a market data approach to his appraisal. He had also made an income approach as described by Mr. Harrison and Mr. Bennett to arrive at a pretaking value of $187,000, but concluded damages to be at the higher figure he found by using market data. He was asked about but knew nothing of a rock crusher in Big Piney Aggregate's relocation at RoHa.

Mr. Hoff gave rebuttal for the owners on the effect of heavy hauling machinery on 10″ aggregate base haul roads, the amount of base under Big Piney Aggregate's stockpile, and the condition of the scale in question.

Mr. Hooker drove from Columbia to the condemnation site during trial to take some pictures underneath the bridge south of his property and testified there were 18 pilings under the bridge.

Appellant charges the court erred (I) in allowing testimony by Mr. Hooker on conditions resulting from construction and maintenance of the existing Highway 66 bridge immediately south of subject property, and in rebuttal with respect to the pictures taken during trial of wood pilings around the footings of the bridge. Appellant argues that such testimony should have been excluded under the rule quoted from VI Wigmore on Evidence, 3rd Ed. 1864, that "the 'simplicative rules' of evidence * * * 'exclude * * * certain kinds of evidence (otherwise admissible so far as Relevancy is concerned) which are found to have an improper effect by obstructing or confusing rather than aiding or facilitating the process of ascertaining the truth. * * So * * * if certain eventual material, having a legitimate probative value, tends

nevertheless to produce also, over and above its legitimate effect, an unfair prejudice to the opponent, * * * there is good ground for excluding such evidence, unless it is indispensable for its legitimate purpose.'" *Daniels v. Dillinger*, 445 S.W.2d 410, 418 (Mo.App.1969).

Appellant makes a number of transcript references where the Highway 66 bridge was mentioned by Mr. Hoff, Mr. Turner, Mr. Becker, and counsel in argument. However, the only transcript references to such testimony by Mr. Hooker are those in which he testified that from physical observations as owner of the property, he noted erosion to his property along Big Piney River due, in his judgment, to channel changes caused by the center pier of the bridge; that such conditions bore on his ideas of the value of the property in question; that the Commission had driven pilings in the area in an effort to correct the condition; and, in rebuttal to testimony from Mr. Becker, that he took pictures of same during the trial.

■ The rule cited by appellant could have been applied by the trial court to exclude this evidence, but it does not require reversal of the trial court for its admission of same. The tendency of the authorities is to admit any evidence as to value of realty condemned which sheds light on the question, leaving it to the discretion of the trial court to keep it within bounds. If the witness knows the property and has such information, knowledge and skill which enable him to form judgment superior to that of the jury, he should be permitted to testify. *State ex rel. State Highway Commission v. Barron*, 400 S.W.2d 33, 37 (Mo.1966). The trial court had similar discretion with respect to receipt of Mr. Hooker's evidence in rebuttal. *Peters v. Dodd*, 328 S.W.2d 603 (Mo.1959); *Rutledge v. Baldi*, 392 S.W.2d 244 (Mo.1965).

■ Appellant charges the court erred (II) in allowing Mr. Hooker to testify to the highest and best use of subject property as a sand and gravel plant and damages thereto with no showing of expertise in absence of ownership of all interests which would entitle him to so testify as the landowner. Appellant argues that Mr. Hooker's testimony should have been excluded under authorities which recognize that ownership alone does not always make testimony on value of property admissible.

In addition to Mr. Hooker's ownership of the real estate in question, the evidence shows that he was a lessor for purposes of the sand and gravel mining operation thereon; that he was familiar with the sand and gravel business generally, and this operation particularly; that he had experience and present responsibilities in business ventures. In such circumstances, Mr. Hooker's testimony fell within the rule that an owner of real estate is competent on the issue of its value in eminent domain when he is particularly familiar with it and knows of the uses to which it is particularly adaptable. *Shelby County R–IV School District v. Herman*, 392 S.W.2d 609 (Mo.1965); *Ward v. Deck*, 419 S.W.2d 286 (Mo.App.1967).

Appellant charges the court erred (III) in allowing evidence of the cost and problems in setting up the RoHa plant as a substitute for the plant being taken because such tends to cause a jury to award costs incident to establishing a new plant which is not within the proper measure of damages.

■ Cost of construction of new facilities to replace condemned facilities is not admissible for purposes of determining value of land taken in eminent domain. *State v. Schaefer*, 530 S.W.2d 813 (Tex.1975); *Accomac Realty Co. v. City of St. Louis*, 347 Mo. 1224, 152 S.W.2d 100 (1941); *Gauley & E. Ry. Co. v. Conley*, 84 W.Va. 489, 100 S.E. 290 (1919); *Fiorini v. City of Kenosha*, 208 Wis. 496, 243 N.W. 761 (1932); Nichols on Eminent Domain, 3rd Ed. 14.2472. However, the evidence in question, in its context, is not subject to the foregoing rule.

■ The first reference to the RoHa plant came during the Commission's cross-examination of Mr. Wilson, by asking him if he was aware that a sand and gravel plant had been set up on a tract south of RoHa for $138,000.

Specifically, appellant complains of testimony by Mr. Hoff that it took 15 to 16 months for Big Piney Aggregate, Inc. to get its RoHa plant into production. The Commission's objection was that the testimony was not relevant. It came in on redirect examination after the Commission's cross-examination in which it attempted to support its position, contrary to that of the owners, that Big Piney Aggregate, Inc., could continue to operate a profitable sand and gravel plant on the several parcels of land remaining after condemnation of the Big Piney's plant at the Big Piney River site.

Appellant's charge goes also to an opinion expressed by Mr. Wilson that a new plant would cost in excess of $300,000. The context of this opinion did not relate to costs of the substitute plant at RoHa. Again, the opinion was elicited on redirect examination after cross-examination by the Commission going to its position that the remainder provided deposits and land to support a feasible mining operation.

Appellant's next specification goes to testimony elicited from Mr. Movshin on cross-examination by the owners with respect to cost of various sizes of rock crushers. Mr. Movshin had just testified at length as the Commission's expert on the value of sand and gravel plants, and the cross-examination in question went to his knowledge of the business without any attempt to relate the value of a rock crusher to the issue of damages.

Similar specification is made with respect to a question to Mr. McReynolds on cross-examination if he knew whether there was a crusher on the RoHa plant. No question of error was preserved by timely objection.

This entire point is aptly postured by appellant's assertion that "[t]hese mentions of this piece of equipment as well as many others throughout the trial could serve only to establish in the minds of the jury that additional expense was being heaped upon these Defendants to conduct their business elsewhere"; and its concession that "in fairness to Defendants, the direct context of these remarks was an indication of the un-

worthiness of the remainder of the subject property and not a blatant plea for set up costs."

■ Appellant charges the court erred (IV) in allowing Mr. Hyams to testify that he had valued the land by capitalizing a royalty value of processed sand and gravel by weight at the scales rather than determining the value of the deposit in the ground and capitalizing that value per unit "because the degree of speculation necessary to his method is not helpful or proper in that the determination the jury must make is the value of the land with the deposit in it."

"Where the entire tract is being taken * * * just compensation is measured by the reasonable market value of the land in *its condition on the day of the appropriation.* * * * When the land contains minerals, the measure of compensation is the value of the land with the minerals in it." *Union Electric Co. v. Jones,* 356 S.W.2d 857, 862 (Mo.1962).

Where, as in this case, less than the whole tract is taken, several techniques, including the capitalization approach, may be used. In this case Mr. Hyams used the capitalization approach on behalf of the owners, as did Mr. Bennett and Mr. Harrison on behalf of the Commission. Mr. McReynolds for the Commission used both market data and income approaches in arriving at his appraisal. The approach was substantially the same with each witness, the major and obvious difference being the choice of capitalization rate. Appellant does not demonstrate how it can use the capitalization approach and at the same time relegate Mr. Hyams' use of the same theory to the realm of inadmissibility.

■ Appellant charges the court erred (V) in failing to sustain its motion for mistrial after striking certain testimony of Mr. Hyams going to "economic viability" of a plant.

Appellant concedes that the court, although refusing to declare a mistrial, did instruct the jury to disregard Mr. Hyams' testimony in question, and no manifest

abuse of discretion is demonstrated to require interference with the trial court's action. *Gathright v. Pendegraft*, 433 S.W.2d 299, 306 (Mo.1968).

Appellant charges the court erred (VI) when it permitted the owners to read into evidence paragraph 19.21 of the original petition "because * * * it is not an admission against the interest of" the Commission.

Mr. Hoff gave his opinion that the highest and best use of the owner's remainder after the condemnation was not for a sand and gravel operation. Part of the basis for his opinion was the cost and use of a certain road under a bridge. An issue arose as to who bore the cost of damage to the bridge in using such road. Mr. Hoff was asked his opinion; the court properly refused it. He was then permitted to read original paragraph 19.21 of the petition which provided, "In the event of damages to said structure * * * caused by defendants * * * all such cost of repair or replacement * * shall be borne by defendants." This portion of 19.21 was deleted by amendment at the outset of the trial.

All appraisals had been made on that basis; it bore on the owner's theory that it was not feasible to reconstruct a sand and gravel operation on their remainder after condemnation; and the Commission had Mr. Hoff read the amended version in support of its side of the issue. In this context, paragraph 19.21 was admissible as an admission against interest. *Littell v. Bi-State Transit Development Agency*, 423 S.W.2d 34, 39 (Mo.App.1967).

Appellant charges the court erred (VII) "throughout the trial" in allowing improper interrogation techniques by defendants' counsel "because these techniques removed any possibility of a proper jury verdict in that the effect was to confuse the jury and to appeal to their passion and prejudice."

Beyond this general statement, appellant suggests one transcript reference to support its charge. Cited by page reference is the cross-examination of Mr. Movshin as it relates to his past experience as an appraiser in blighted areas of St. Louis, a proper field for testing Mr. Movshin's expertise for appraisal of a sand and gravel operation. The excuse for failure to cite reviewable page references is that "Plaintiff is hesitant to go through 1109 pages of transcript looking for all examples of improper or questionable examination questions and comments by defendants' attorney." The court is not obliged to do so for the appellant.

Appellant charges the court erred (VIII) with respect to rebuttal testimony offered by the landowners.

The first specification relates to Mr. Hoff's testimony on the condition of the scale at the Big Piney plant; the second to the testimony of Mr. Hooker as to the photographs and existence of pilings around the 66 bridge. The testimony of Mr. Hoff was within the court's discretion in answer to that given by Commission witnesses Movshin and Baker; the admissibility of Mr. Hooker's testimony has been considered under (I) above. *Peters v. Dodd*, supra.

Finally, appellant charges (IX) that "the errors set out in Points I through VIII certainly were prejudicial to the result in this law suit either individually or viewed together." Suffice to say that Points I through VIII have been found wanting individually, and they acquire no additional substance "viewed together." *Chism v. Cowan*, 425 S.W.2d 942 (Mo.1967).

Judgment affirmed.

All concur.